**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| RUSSELL WATSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACT. NO. 1:21-cv-272-TFM-M |
| | : | |
| CITY OF PRICHARD, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is *Defendant's Motion for Summary Judgment and Supporting Memorandum of Law*. Doc. 25, filed May 23, 2022. Defendant City of Prichard requests the Court enter summary judgment against Plaintiff Russell Watson for his single claim of race discrimination that is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. *Id*. at 1. Having considered the motion, response, reply, objections, and relevant law, the motion is **GRANTED**.

## I.      JURISDICTION AND VENUE

No party contests jurisdiction or venue, and the Court finds adequate support for both. The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action arose within this district and the City of Prichard ("the City") is a local government. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. . . . General personal jurisdiction, on the other hand, arises from a

defendant's contacts with the forum that are unrelated to the cause of action being litigated.  The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiff's claims occurred in this judicial district.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Jimmie Gardner ("Mayor Gardner") is the mayor of Prichard, Alabama, and all of the departments in the City report to the mayor for day-to-day operations.  Doc. 25-1 at 2, 4, 5.  Before Mayor Gardner was elected to his position as mayor, he served as the chief of police and assistant chief for the Prichard Police Department ("the Prichard PD").  *Id.* at 2, 3.  Walter Knight ("Chief Knight") took over as chief of police after Mayor Gardner was elected to his position.  *Id.* at 2-3; Doc. 31-2 at 5.

At all relevant times, the City had a written "Equal Employment Policy," which stated race, among other characteristics, would not be a factor in employment related decisions.  Doc. 25-3 at 5.

Mayor Gardner testified the population of the City is approximately ninety percent African American, which matches the demographics of the Prichard PD.  Doc. 25-1 at 27.  Chief Knight testified the Prichard PD is between eighty to eighty-five percent African American, with one Hispanic officer and the rest Caucasian.  Doc. 31-2 at 60.  Mayor Gardner testified it is tough for the City to recruit and retain employees at the Prichard PD, which he viewed as a "training ground" for other departments because of the tendency of officers to leave for other departments.  Doc. 25-

1 at 26, 28.  Chief Knight testified the Prichard PD pays well below other municipalities.  Doc. 25-2 at 24.  The mayor has the sole authority to hire, fire, and promote employees of the Prichard PD. *Id.* at 6-7.

The Prichard PD chain of command from lowest to highest rank is police officer 1, corporal, sergeant, lieutenant, captain, major, and chief.  Doc. 31-2 at 3-5.  All of the ranks, except for police officer 1, are considered supervisory roles.  *Id.*  None of the ranks with supervisory roles have the ability to hire, fire, or issue discipline, only the mayor has such an ability after a trial-board hearing and subsequent recommendation, but they are able to recommend discipline.  *Id.* at 13-14; Doc. 25-2 at 8-9.  The duties of a corporal are to oversee patrolmen, and answer their questions, and fulfill the duties of a patrolman.  Doc. 31-2 at 7.  If a corporal is the only supervisor available, they can issue job or duty assignments, verify their subordinates turn in their reports, and read and correct those reports.  *Id.* at 7-9.  The duties of a sergeant are to be responsible for a shift, oversee patrolmen, verify their subordinates turn in their reports, read and correct those reports, create reports, and report officer concerns or needs to lieutenants.  *Id.* at 11-13.

The Mobile County Personnel Board ("MCPB") is responsible for posting job openings for the police department and determines whether candidates are qualified for a posted position.  Doc. 25-4 at 19.  The MCPB scores candidate applications based on the responses to questions and transmits the list of qualified applicants to the hiring department.  Doc. 25-5 at 16-18.  While the MCPB ranks the qualified applicants, the list of qualified applicants is transmitted in alphabetical order to the hiring department without reference to the applicants' rankings.  *Id.* at 17-18.  The MCPB notifies qualified applicants of their ranking via email.  *Id.* at 18.

Plaintiff Russell Watson ("Plaintiff" or "Watson") was hired by the Prichard PD on September 3, 2013, as a Patrol Officer I.  Doc. 25-4 at 3-4.  Prior to his employment with the

Prichard PD, Watson briefly worked as a stocker at Walmart, and prior to that, he practiced as an attorney for approximately sixteen years. *Id.* at 26-27; Doc. 31-3 at 3-5.

In 2017, Watson was recognized as a shift supervisor. Doc. 31-5 at 13-14. As a shift supervisor, Watson supervised up to four officers on a shift, had the authority to recommend discipline, and could send officers home for behavior issues, a decision that could be overturned. *Id.* at 16-17. Watson took on the additional role of internal affairs investigator from 2015 to 2018, the investigative duties of which were citizen complaints, ethical and criminal violations by officers, and violations of general orders or standard operating procedures. *Id.* at 9-12. On July 22, 2017, Watson was promoted to sergeant by Mayor Gardner at the recommendation of Chief Knight after Watson completed a qualification exam with twelve or thirteen other candidates and was the only one to pass. Doc. 25-4 at 6; Doc. 25-2 at 18. As a sergeant, Watson supervised up to four officers on a shift. Doc. 31-5 at 15, 17.

Prichard PD currently has two major-rank positions, one of which oversees the criminal investigation division and the other oversees the patrol division, and they also act as assistant chiefs of police. Doc. 25-2 at 11-12. The major-rank position is referred to as a police administrative officer ("PAO"). Doc. 31-2 at 15. The PAO positions were created in the Prichard PD by former Chief of Police Lawrence Battiste, who preceded Mayor Gardner as the chief of police. Doc. 25-2 at 14, 26. When Chief Knight became chief of police, the two PAO positions were vacant. *Id.* at 26. Mayor Gardner decided, at some point, Chief Knight required assistance, and decided to fill one of the available PAO positions. *Id.* at 31.

In 2017, Suzette Moore ("Moore"), the human resources coordinator for the City, sent the MCPB a requisition to fill one of the available PAO positions, for which only one applicant qualified because the position description required the applicant to be attached to the Prichard PD

and possess a certain number of years of experience.  Doc. 25-5 at 2, 6.  In May 2017, at Mayor Gardner's request, Moore sent the MCPB a request to amend the job description for the PAO position to remove the requirement that the applicant actively be working for a law enforcement agency and currently Alabama Peace Officers' Standards and Training Commission ("APOSTC") certified.  Doc. 25-2 at 30; Doc. 25-5 at 6-7; Doc. 25-7 at 1.  Instead of current APOSTC certification, the amendment would allow candidates to complete a two-week refresher course within one year of hire.  Doc. 25-7 at 1; Doc. 25-8 at 2.  Chief Knight and Moore both testified the reason for the amendment to the PAO qualifications was to broaden the pool of qualified candidates to those outside of the Prichard PD.  Doc. 25-2 at 30-31; Doc. 25-5 at 7-8.

On June 20, 2017, the MCPB posted the PAO position description.  Doc. 25-8.  A qualified candidate for the major position was required to possess:

> [A] minimum of two years of college level course work in criminal justice, police administration, public administration or a closely related field, and five years experience as a sworn law enforcement officer, including a minimum of two years administrative and supervisory experience; or a combination of education and experience equivalent to these requirements.

*Id.*

Watson stated he applied for the 2017 PAO posting but withdrew his application before the MCPB prepared the eligibility list.  Doc. 25-4 at 28-29.  Mayor Gardner conducted interviews of the qualified candidates, and as a result, Dwayne Hill ("Major Hill") was selected for the position.  Doc. 25-5 at 7-8.

After Chief Knight observed Major Hill was "stretched pretty thin" overseeing both the criminal investigation and patrol divisions, he recommended to Mayor Gardner they fill the vacant second PAO position, which Mayor Gardner approved.  Doc. 25-2 at 25.  On October 2, 2019, Moore emailed the MCPB and she stated Mayor Gardner approved the job post for the vacant PAO

position, which would be available for applicants to apply from October 3, 2019 to October 16, 2019.  Doc. 25-10.  The job description that was used for the 2019 PAO posting was the same that was used for the amended 2017 PAO posting.  Doc. 25-8; Doc. 25-10.

Watson submitted to Chief Knight, Major Hill, and Captain Michael Knight a memorandum dated October 9, 2019, that discussed employment related issues.  Doc. 25-11.  In the memorandum, Watson specifically addressed inadequate training, shortage of personnel, lack of notice to current department employees about the availability of the PAO position, and administrative decisions.  *Id.*  As to the PAO posting, Watson stated he believed the position was available "to bring in a previously selected outsider or former employee."  *Id.*; Doc. 25-4 at 22-23.  Chief Knight did not consider Watson's memorandum to be a job performance issue because Watson "was doing his job."  Doc. 31-2 at 37.

On October 15, 2019, Watson submitted to the MCPB his application for the PAO position.  Doc. 25-6.  After the posting closed, the MCPB sent the list of qualified applicants and their application packages to Moore, who provided the same to Chief Knight.  Doc. 25-5 at 18; Doc. 31-2 at 82.  Robert Thompson ("Thompson"), Aaron Tucker ("Tucker"), and Watson were the qualified applicants.  Doc. 25-2 at 36.  Both Thompson and Tucker are African American.  Doc. 31-5 at 69.  The MCPD informed Tucker via email he was ranked first on the employment eligible list.  Doc. 25-14.

At the time of the 2019 PAO posting, Thompson was a captain with the Prichard PD.  Doc. 31-8 at 11.  Thompson began his career with the Prichard PD in 2003 as a patrol officer, was promoted to sergeant and served at that rank for approximately four years, then was promoted to lieutenant in 2012 and served at that rank until 2018 when he was promoted to captain and was in charge of the records and dispatch departments.  *Id.* at 5-9.

At the time of the 2019 PAO posting, Tucker was an unemployed former police officer and his APOSTC certification had lapsed.  Doc. 31-7 at 73-75.  Tucker received his GED in 1997 then received his associate degree in criminal justice in 2013.  *Id.* at 4-5.  Tucker was hired by the Prichard PD in 2001 as a patrol officer then was promoted to corporal around 2008 and worked for the department until 2011.  *Id.* at 6, 12-14, 30-33.  Tucker resigned from the Prichard PD in July 2011 to work for the Mobile Police Department ("the Mobile PD"), where he began his duty on July 4, 2011, as a patrolman, the rank he held until 2019.  *Id.* at 7, 34.  Tucker stated he left for the Mobile PD because he wanted to work at another agency with structure and to observe how another agency operated, but intended to return to the Prichard PD.  Doc. 25-15 at 5-6.  While Tucker was employed with the Mobile PD, he was a member of the Mobile County Street Enforcement Narcotics Team ("MCSENT").  Doc. 25-2 at 50.  As a member of MCSENT, Tucker would visit the Prichard PD as needed for suspect interviews, approximately once or twice per month.  Doc. 31-2 at 99-101.

In December 2016, Tucker's wife, who was employed as a patrolman with the Saraland Police Department, was shot while on duty.  Doc. 31-2 at 102; Doc. 31-7 at 8.  Tucker took a leave of absence from the Mobile PD to take care of his wife while she recovered and returned to his patrol duty in the beginning of 2018.  Doc. 31-7 at 8-9.  Tucker continued his patrol duties until March 2019, when he resigned due to family issues and to take care of his wife.  *Id.* at 10.

On November 19, 2019, Chief Knight and Moore interviewed the three candidates and, on December 3, 2019, released a formal announcement that Tucker was awarded the position.  Doc. 34-4 at 41-42, 44-45; Doc. 31-5 at 37.  Moore reviewed the applications and described her purpose in the interviews as "there to monitor," and did not make a recommendation for the job.  Doc. 31-4 at 55-56.  Chief Knight conducted the applicant interviews and based his recommendation on

the applicants' interview performance and applications.  Doc. 31-2 at 71-72.  Chief Knight stated he asked the applicants preselected interview questions, and in addition, asked each of the candidates what they could bring to the Prichard PD that was not already there.  Doc. 25-2 at 52. Moore handwrote notes during each applicants' interview that were based on their answers to the interview questions.  Doc. 25-16; Doc. 25-17; Doc. 25-18.  Moore believed both Thompson and Watson could perform the duties of the major position and would have picked Watson if she had to choose.  Doc. 31-4 at 81-82.  Moore did not believe Tucker interviewed well.  *Id.* at 72.

In Tucker's application for the PAO position, he included only his work experience with the Prichard PD.  Doc. 31-7 at 42.  Tucker explained, "Prichard knew that I left, and I figured it was in the system already that I left them and to go work for Mobile [PD]."  *Id.* at 43.  Chief Knight stated Tucker's application did not list supervisory experience, but he was aware Tucker worked for the Mobile PD as a police officer 1 and believed he held that position until 2018, but during his final two years, he was on Family Medical Leave Act leave.  Doc. 31-2 at 104-08.

Based on Moore's interview notes, Tucker discussed his experience with the Mobile PD during his interview.  Doc. 39-1 at 2.  Chief Knight stated Tucker, during his interview, suggested improvements for the Prichard PD that he learned while he worked with the Mobile PD, which included means to encourage timely submission of officer reports.  Doc. 31-2 at 120-24.

Prior to Watson's interview, he emailed Moore to explain why there were financial incentives to hire for the major position from within the Prichard PD and he was willing to accept a lesser pay grade for the first few years of his service if he were hired for the position.  Doc. 31-5 at 54-60.  Watson intended for Moore to disseminate the proposal from his email to Mayor Gardner and Chief Knight.  *Id.* at 55.  Before Watson's interview, Moore mentioned the email to Chief Knight and explained to him its contents.  Doc. 31-2 at 85-86.  During Watson's interview,

he discussed with Moore the ideas that he conveyed in his email, but Chief Knight stated he was unaware of the email until he talked with Moore about it after the interview. *Id.* at 139-40. Moore forwarded Watson's email to Mayor Gardner. Doc. 31-4 at 43-44.

Chief Knight's opinion of Watson was he did not have any issues with Watson's work performance other than his violation of the Prichard PD uniform policy, an issue Mayor Gardner also observed. Doc. 25-1 at 20-21; Doc. 25-2 at 20-21.

Chief Knight's opinion of Thompson was he was a passive supervisor who would not act to correct an issue with those who he supervised until a superior would say something to him about it. Doc. 25-2 at 43.

Chief Knight drafted a memorandum to Mayor Gardner that was dated December 2, 2019, in which he recommended Tucker for the major position because he would "bring something different to the police department" and Chief Knight desired to "change the image of the police department" and "a "fresh face [would] be just the thing that the [Prichard PD] need[ed] to push [the department] in that direction." Doc. 31-6 at 18. Chief Knight stated the deciding factor between Tucker and Watson was Tucker's law enforcement work experience. Doc. 25-2 at 62. Chief Knight told Mayor Gardner, after it was decided Tucker would be awarded the 2019 PAO position, if the Prichard PD could accommodate another major position, he would promote Watson and he planned to promote Watson to lieutenant. Doc. 31-2 at 151-52.

Before Mayor Gardner received Chief Knight's recommendation memorandum, he conducted follow-up interviews with each of the candidates that lasted between fifteen and thirty minutes. Doc. 31-1 at 12, 15-22, 25. Mayor Gardner asked each candidate to tell him about themselves and why they thought they would be a good fit for the PAO position. Doc. 25-1 at 10. Mayor Gardner recalled Thompson spoke about what he believed he could bring to the Prichard

PD as a PAO, the positions that he held in the department, and how he would be a good fit for the position. *Id.* at 12-13. Mayor Gardner recalled Tucker also spoke about what he believed he could bring to the Prichard PD as a PAO and policies that he thought would impact morale and solidarity, including policies related to the department dress code. *Id.* at 13-14. Mayor Gardner recalled Watson spoke about how he was a great fit for the PAO position, he possessed a law degree, and practiced law in Baldwin County. *Id.* at 11-12. Ultimately, Mayor Gardner stated he relied on Chief Knight's recommendation to make his final decision. Doc. 31-1 at 28. If Chief Knight had recommended either Thompson or Watson for the major position, Mayor Gardner stated he would have raised concerns that he had about them to Chief Knight. Doc. 25-1 at 18-19.

Tucker believed he received notice that he was selected for the PAO position from Chief Knight via a phone call but cannot remember the date of the call. Doc. 31-7 at 48-49. Tucker received an official letter that was dated December 3, 2019, from Mayor Gardner that informed him he was selected for the major position and he would begin his duties on December 7, 2019. Doc. 25-15 at 6. At the time when Tucker became a PAO, his APOSTC certification was not up to date and was required to attend a two-week refresher course in order to be recertified. *Id.* at 6-9.

Watson alleges Mayor Gardner and Chief Knight intentionally discriminated against him. Watson stated the PAO position was created for Tucker, Tucker was a long-standing friend of Mayor Gardner and Chief Knight, he worked with them, and they did things together. Doc. 25-4 at 34. Watson believed his race was a factor in the award of the position because there was no other rational basis for the decision that was made, based on his credentials, work experience, education, and accomplishments. *Id.* at 34-35. Watson acknowledged Tucker was employed longer in law enforcement but noted Tucker was only able to obtain the rank of corporal, which

reflected on his work performance. *Id.* at 35-36. Watson admitted he never heard either Mayor Gardner or Chief Knight make any racially derogatory comments about white people. *Id.* at 40.

Watson believed African-American officers were disciplined less harshly than white officers in the Prichard PD. *Id.* at 95-98. Watson provided examples of the disparity in discipline during his deposition: (1) an African-American officer was permitted to assault another younger white officer and was not disciplined, (2) an African-American officer called a murder suspect to advise him the police were on their way to his mother's house, and he was not censured, (3) an African-American officer ran over another officer and was not disciplined, (4) an African-American officer was caught stealing fuel and was given a ten-day suspension that he did not serve. *Id.* Watson drafted a memorandum that described the first three instances of discipline disparity and sent it to the Prichard PD chain of command. *Id.*; Doc. 31-2 at 49-53. Chief Knight stated he did not know about what Watson referred to in the first two instances of discipline disparity, but he knew about the third instance and explained the circumstances around it: the officer hit another officer with his car when he attempted to assist in an arrest while it was dark. Doc. 31-2 at 51-53.

Watson stated multiple African-American Prichard PD officers who worked side jobs while they were on duty were not disciplined. Doc. 31-5 at 98-99. Watson reported this information to Major Tucker and Captain Knight. *Id.* at 99-100. If an officer works a side job, they are required to procure a work permit and cannot be on duty because it is an ethics violation. *Id.* at 101.

Tucker states, on September 10, 2021, Watson instructed a subordinate officer to release a suspect who was previously in a vehicle pursuit in an attempt to elude arrest by the officer. Doc. 25-26 at 1. Tucker asked Watson and the officer to report to his office to discuss the incident, and Watson was the first to arrive. *Id.* At the time, Tucker was seated at his desk and Watson sat

across from him.  *Id.*  While Tucker and Watson discussed what occurred, Tucker states Watson became angry, loud, and aggressive, and he stood up in a threatening manner, pointed his finger at Tucker, yelled, and attempted to walk behind Tucker's desk, at which time Tucker instructed Watson to leave his office.  *Id.* at 1-2.  Watson stated it was a mutual argument, they were shouting and cussing at each other, and it was the type of argument that happens on a weekly basis.  Doc. 31-5 at 114-15.  Watson was demoted for the incident.  *Id.* at 114.

Watson stated similar arguments occurred with African-American officers, specifically between Horace Jackson and Tucker when they were "in each other's face" and cussing at each other and between Officer Jones and Tucker when they were "in each other's face."  *Id.* at 116-17. Watson stated he witnessed the argument between Jackson and Tucker and described their faces were inches apart but does not know if Jackson pointed his finger at Tucker during the argument. Doc. 25-4 at 58.  Watson stated he does not know if either Jackson or Jones were disciplined for the incidents, but neither of them were demoted.  *Id.*

On December 26, 2019, Watson filed with the Equal Employment Opportunity Commission ("EEOC") a charge of discrimination in which he claimed he was not selected for the 2019 PAO position because of his race.  Doc. 25-30.  On March 11, 2021, the EEOC issued a Memorandum and Recommendation for Closure in which it was recommended Watson's charge be dismissed/closed because reasonable cause for the charge was not found.  Doc. 25-31.

**B.    Procedural Background**

On June 10, 2021, Plaintiff originally filed with this Court his Complaint against the City in which he brings a claim of race discrimination, pursuant to Title VII of the Civil Rights Act of 1964.  Doc. 1.  The City filed its Answer on July 12, 2021.  Doc. 7.

On May 23, 2022, the City filed the instant motion for summary judgment.  Docs. 25.

Plaintiff timely filed his response to the motion and the City its reply.  Docs. 30, 39.  Relatedly, on June 30, 2022, the City filed its objections to portions of Plaintiff's evidentiary submissions that were referenced in its response to the motion for summary judgment.  Doc. 38.  Plaintiff filed his response to the City's objections and the City filed its reply.  Docs. 42, 45.  The motion for summary judgment and its related objections are fully briefed and ripe for review, and the Court finds oral argument unnecessary.

## II.      STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R. CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co.*, 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).[1]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a

---

[1] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. Only disputes about the material facts will preclude the granting of summary judgment. *Id.*

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## III.   DISCUSSION AND ANALYSIS

The Court will first address the City's objections to portions of Plaintiff's evidentiary submissions that were filed in support of his response to the motion for summary judgment then the Court will address the motion for summary judgment.

**A.   The City's Objections to Portions of Plaintiff's Evidentiary Submissions That Were Filed in Support of His Response to The Motion for Summary Judgment**

The City objects to certain statements that were submitted by Plaintiff in support of his response to the motion for summary judgment. The City specifically objects to the following statements:

(1)   Moore heard from an unidentified source Tucker was preselected for the major position;

(2)   Moore stated, "I just felt like they were going to get Aaron Tucker, so it didn't really matter about the scoring," in reference to why she did not score the applicants who were interviewed for the major position;

(3)     "[I]t was floating around that they were going to get [Tucker] anyway."

(4)     Reserve Patrol Officer Todd Pitts ("Officer Pitts") told Watson on two occasions Tucker was "pre-selected" for the position;

(5)     Major Hill also told Watson that Tucker was pre-selected and "it was a done deal;"

(6)     Moore told Watson that Mayor Gardner is a racist and on two occasions told Watson that Mayor Gardner "resists promoting whites;" and

(7)     Lieutenant Rios told Watson that Mayor Gardner was a racist.

Doc. 38 at 5-6.

The City's brief on its objections divides the argument by the identity of the declarant, so the Court will order its analysis in the same manner.

### 1.     General Law

The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (internal quotation marks omitted). Nevertheless, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323.

The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (noting that an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness).

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012).

Hearsay is "a statement that the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c)(1)-(2). "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805. Hearsay is inadmissible unless otherwise

provided by a federal statute, the Federal Rules of Evidence, or other rules that are prescribed by the Supreme Court.  FED. R. EVID. 802.

### a.      Suzette Moore

The City argues Moore cannot identify anyone who told her Tucker was pre-selected for the major position, her testimony as to that information was based on a rumor that was "floating around" the department, she was not a decisionmaker and did not have significant involvement in the hiring decision beyond ministerial duties, and she was not employed in a management-level capacity with the City at the time of Tucker's hiring.  Doc. 38 at 6-8.  In response, Plaintiff argues Moore's statements are hearsay exceptions that fall under Fed. R. Evid. 801(d)(2)(D) because they are out-of-court statements that are offered against the City by its agent or employee on a matter that was within the scope of the relationship while it existed.  Doc. 42 at 6-7.  Plaintiff also argues Moore's statements are hearsay exceptions that fall under Fed. R. Evid. 803(3) because they reflect her perceptions of events during her employment.  *Id.* at 7.  Finally, Plaintiff argues the statement are not offered to prove the truth of the matter asserted but for the non-hearsay purpose to explain the conduct of, and give context to, Moore's reasons not to score or rank the applicants during the interview process.  *Id.* at 8.

Moore stated she could not identify who told her Tucker was pre-selected for the major position and such speculation was "floating around."  Doc. 38-1 at 5, 13.  Since Moore cannot identify who told her Tucker was pre-selected, a declarant cannot be called to testify and, therefore, her statements would have to fall under an exception to hearsay to be admissible.

### i.      Fed. R. Evid. 801(d)(2)(D)

Excepted from the definition of hearsay [ ] is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," which is deemed an admission by a party opponent.  *See* FED. R. EVID. 801(d)(2)(D).  Thus, statements made by a supervisory

official who plays some role in the decision making process are generally admissible. *See, e.g.*, *Miles v. M.N.C. Corp.*, 750 F.2d 867, 873-75 (11th Cir. 1985).

*Zaben v. Air Prods. & Chems.*, 129 F.3d 1453, 1456 (11th Cir. 1997) (per curiam).

Moore stated her responsibility during the interviews for the major position was to monitor them, and she stated she did not "do any recommendations" for the position.  Doc. 38-1 at 12.  Moore did not discuss the interviews with Chief Knight and was not involved with Mayor Gardner's follow up interviews with the candidates.  *Id.* at 15-17.  Nor did Moore discuss with anyone the interviews with Mayor Gardner.  *Id.* at 17.  Watson believed Mayor Gardner and Chief Knight were the only two individuals who were involved in the decision to hire for the major position.  Doc. 38-2 at 4-5.  Chief Knight explained Moore's role in the major position interviews was to verify the proper questions were asked, set up the interviews, and verify the identity of the candidates, but she did not have any authority to recommend who was hired for the position.  Doc. 38-3 at 2-3.

Since Moore's role in the PAO interview process was limited to ministerial tasks and her statements are not attributable to those with decision-making authority, the Court finds Moore's statements are not hearsay exceptions that fall under Fed. R. Evid. 801(d)(2)(D).

### ii.   Fed. R. Evid. 803(3)

Fed. R. Evid. 803(3) excepts from hearsay:

> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Moore's statements, as argued by Plaintiff, serve to explain why she felt the way she did and why she chose not to score the interviews, which are post-incident statements of memory or belief to prove a fact remembered, and are not hearsay statements that describe her then-existing state of

mind.  Therefore, the Court finds Moore's statements are not hearsay exclusions that fall under Fed. R. Evid. 803(3).

### iii.    Fed. R. Evid. 806

Plaintiff argues he does not offer Moore's statements to prove the truth of the matter asserted but for the non-hearsay purpose to explain the conduct of, and give context to, Moore's reasons not to score or rank the applicants during the interview process.  *Id.* at 8.  In support, Plaintiff cites *United States v. Price*, 792 F.2d 994 (11th Cir. 1986), for the proposition that statements that are offered to put into context other statements do not constitute hearsay.  *Id.* Plaintiff does not cite a Federal Rule of Evidence upon which he rests his argument, but the context of the citation from *Price* is a discussion of Fed. R. Evid. 806, which states:

> When a hearsay statement-or a statement described in Rule 801(d)(2)(C), (D), or (E)-has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.  The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.  If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

Fed. R. Evid 801 (d)(2) excepts from hearsay a statement that is offered against an opposing party and "was made by a person whom the party authorized to make a statement on the subject," "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed," or "was made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(C), (D), (E).

Plaintiff has not shown Moore's hearsay statements would be admitted in evidence in order for Fed. R. Evid. 806 to apply to them.

Therefore, the City's objections are sustained as to Moore's above statements.

### b.    Russell Watson

The City objects to the above statements by Plaintiff because the statements are inadmissible and cannot be reduced to admissible form.  *Id.* at 1-2.

Plaintiff argues his statement that Major Hill told him that Tucker was pre-selected and "it was a done deal" are hearsay exceptions under Fed. R. Evid. 801(d)(2)(D) because they are out-of-court statements that are offered against the City by its agent or employee on a matter that is within the scope of that relationship while it existed.  *Id.* at 8.  Plaintiff argues Moore's statement to him that Mayor Gardner is a racist and resists promoting white candidates and Lieutenant Rios's statement to Plaintiff that Mayor Gardner was a racist may be reduced to admissible evidence at trial because Moore and Lieutenant Rios may be called as witnesses at trial.  *Id.* at 9.  Further, Plaintiff argues Moore and Lieutenant Rios's statements to him are hearsay exceptions under Fed. R. Evid. 803(21) as statements that concern the reputation among a person's associates or in the community about a person's character.  *Id.*  Plaintiff argues his statements are hearsay exceptions under Fed. R. Evid. 803(3) because they serve to establish his state of mind and perceptions that led him to submit the October 9, 2019 memorandum to his chain of command and file his EEOC charge of discrimination.  *Id.* at 8-10.  Finally, Plaintiff argues his statements are hearsay exceptions under Fed. R. Evid. 803(3) because they are statements that reflect his perception of events that occurred during his employment, state of mind, and perceptions.  *Id.* at 9-10.

### i.      **Fed. R. Evid. 801(d)(2)(D)**

Plaintiff neither offers evidence nor alleges Major Hill was involved in any aspect of the hiring process for the 2019 PAO position.  Therefore, the Court finds Watson's statement about Major Hill's statement is not a hearsay exception that falls under Fed. R. Evid. 801(d)(2)(D).

### ii.     **Fed. R. Evid. 803(21)**

Fed. R. Evid. 803(21) excepts from hearsay a statement of "[a] reputation among a person's associates or in the community concerning the person's character."  However, "[e]vidence of a

person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait" but "may be admitted under Rules 607, 608, and 609." FED. R. EVID. 404(a)(1), (3). Relevant to the Court's inquiry as to reputation evidence is Fed. R. Evid. 608(a), which states:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a) is "strictly limited to character for veracity, rather than allowing evidence as to character generally." FED. R. EVID. 608 advisory committee's note to subdivision (a).

Moore and Lieutenant Rios's statements to Plaintiff ultimately are not related to Mayor Gardner's character for veracity and is not admissible character evidence pursuant to Fed. R. Evid. 608.

### iii. Fed. R. Evid. 803(3)

Plaintiff argues he offers the statements to him by Major Hill, Lt. Rios, Officer Pitts, and Moore to show his mental state when he submitted his October 9, 2019 memorandum to his chain of command and file his EEOC charge. Doc. 42 at 9-10. Fed. R. Evid. 803(3) excludes from hearsay "[a] statement of the *declarant's* then-existing state of mind . . . or emotional, sensory, or physical condition." The statements to Plaintiff by Major Hill, Lt. Rios, Officer Pitts, and Moore are offered by him to show his then-existing state of mind but he was not the declarant. Therefore, the statements to Plaintiff by Major Hill, Lt. Rios, Officer Pitts, and Moore are not hearsay exclusions under Fed. R. Evid. 803(3).

Therefore, the City's objections are sustained as to the above statements to Plaintiff by Major Hill, Lt. Rios, Officer Pitts, and Moore.

**B.      Motion for Summary Judgment**

Plaintiff claims the City discriminated against him when it did not select him for the 2019 PAO position and selected a less qualified African-American candidate for the position.  Doc. 1 at 2-3.  The City argues Plaintiff has not established a *prima facie* case of race discrimination because he has not provided evidence that shows Tucker was equally or less qualified than him and he has not identified a similarly situated individual who is outside of his protected class who was treated more favorably.  Doc. 25 at 2.  Further, the City argues, even if Plaintiff has established a *prima facie* case of race discrimination, the City has articulated legitimate, nondiscriminatory reasons for the alleged discriminatory act.  *Id.*  Plaintiff argues the City's legitimate, nondiscriminatory reasons for the alleged discriminatory act is pretext for unlawful discrimination and, in addition, he has presented a convincing mosaic of circumstantial evidence that raises an inference of intentional discrimination by the City.  Doc. 30 at 28-38.

Under Title VII, it is unlawful for an employer: (1) "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1)-(2).

"A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination."  *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086-87 (11th Cir. 2004), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc) (*Lewis I*).  Direct evidence

is "evidence that, if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson*, 376 F.3d at 1086 (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). "'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

While Plaintiff has identified an African-American candidate for the position for which he applied who was offered that same position, that is not direct evidence that Plaintiff was not hired for that position because of his race. Rather, it requires inference. Therefore, Plaintiff must rely on circumstantial evidence to support his claim of race discrimination.

### 1.   *McDonnell Douglas* Framework

Since Plaintiff relies on circumstantial evidence, the burden-shifting framework that is outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 668 (1973) [hereinafter *McDonnell Douglas*], applies. *Jenkins*, 26 F.4th at 1249 (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010)).

> Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a *prima facie* case of race discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated "similarly situated" employees outside his class more favorably. *Lewis I*, 918 F.3d at 1220-21. To establish the fourth prong, the plaintiff must present evidence of a comparator-someone who is "similarly situated in all material respects." *Id.* at 1224. Although what constitutes a "material" similarity or difference will differ from case to case, ordinarily a similarly situated comparator and the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history. *Id.* at 1227-28.

*Jenkins*, 26 F.4th at 1249.

If the plaintiff makes out their *prima facie* case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. *Lewis I*, 918 F.3d at 1221 (citing

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). If the defendant articulates a legitimate nondiscriminatory reason for its actions, the plaintiff must then demonstrate the defendant's proffered reason was merely a pretext for unlawful discrimination. *Id.* A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. Cnty. Comm'n of Jefferson Cnty. Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

    **a.**    ***Prima Facie* Case**

In the City's reply to the motion for summary judgment, it concedes for summary judgment purposes Plaintiff established a *prima facie* case of race discrimination and shifted the burden to the City to articulate a legitimate nondiscriminatory reason for its actions.[2] Doc. 39 at 1-2.

> Under the *McDonnell Douglas* scheme, "[e]stablishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, [450 U.S.] at 254, 101 S. Ct. at 1094. To establish a "presumption" is to say that a finding of the predicate fact (here, the *prima facie* case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination. 1 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 67, p. 536 (1977). Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the *prima facie* case-*i.e.*, the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.* at 254-55 n.8, 101 S. Ct. at 1094-95 n.8. It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U.S. at 254, 101 S. Ct. at 1093. In this regard it operates like all presumptions, as described in Federal Rule of Evidence 301:

---

[2] The parties disagree as to whether the fourth prong of a *prima facie* case for race discrimination requires a plaintiff to provide a similarly situated comparator, based on conflicting lines of precedent in the Eleventh Circuit. *Compare* Doc. 25 at 27-30 *with* Doc. at 26-28.

> In all civil actions and proceedings not otherwise provided for by
> Act of Congress or by these rules, a presumption imposes on the
> party against whom it is directed the burden of going forward with
> evidence to rebut or meet the presumption, but does not shift to such
> party the burden of proof in the sense of the risk of nonpersuasion,
> which remains throughout the trial upon the party on whom it was
> originally case.

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407

(1993).

### b.    Legitimate, Nondiscriminatory Reason

The City argues it hired Tucker instead of Plaintiff for the 2019 PAO position because

Tucker had at least ten more years of law enforcement experience, including five years of

supervisory experience, Tucker performed better than Plaintiff in his interview, and Tucker

possessed the external quality that Chief Knight stated was necessary to provoke change and

correct the complacent attitudes of employees at the Prichard PD.  Doc. 25 at 30.

### c.    Pretext

Since the City has articulated legitimate, nondiscriminatory reasons for its decision to hire

Tucker, rather than Plaintiff, for the 2019 PAO position, "the presumption of discrimination is

rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged

reason[s] of the employer [are] a pretext for illegal discrimination." *Crawford v. City of Fairburn*,

482 F.3d 1305, 1308 (11th Cir. 2007) (quoting *Wilson*, 376 F.3d at 1087).  "The plaintiff must

meet the reason proffered head on and rebut it."  *Id.* (citing *Wilson*, 376 F.3d at 1088).  "If the

employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut

each of the reasons to survive a motion for summary judgment." *Id.* (citing *Chapman v. AI Transp.*,

229 F.3d 1012, 1037 (11th Cir. 2000) (en banc)).

Plaintiff presents numerous instances that he argues show pretext of discrimination by the

City: (i) Chief Knight stated the only reason Tucker, rather than Plaintiff, was selected for the 2019 PAO position was Tucker possessed more years of law enforcement experience than Plaintiff, which contravenes the City's contention there were multiple factors that influenced the decision, Doc. 30 at 28-29; (ii) the submitted evidence shows Major Hill, Officer Pitts, Moore, and Plaintiff were aware Tucker was pre-selected for the second major position, which shows pretext, *id.* at 29-30; (iii) Tucker submitted false information on his application that indicated he met the APOSTC certification requirement that was described in the application, which should have disqualified him from consideration and is further evidence of pretext, *id.* at 30; the City's proffered reason to hire Tucker for the 2019 PAO position, Tucker's greater years of law enforcement experience, is inconsistent with its other proffered reason for the decision, the external quality that Chief Knight stated was necessary to provoke change and correct the complacent attitudes of employees at the Prichard PD, *id.* at 30-31; (iv) Tucker and Plaintiff possessed equal experience in the relevant field of law enforcement, since Tucker did not include his experience with the Mobile PD on his application for the second major position, *id.* at 31; (v) the City's claim that Tucker interviewed better than Plaintiff is speculative and not supported by the record because Chief Knight testified he could not recall much of what was discussed in the candidate interviews and could not state whether he actually scored and ranked Tucker over Plaintiff, *id.* at 31-32; (vi) the City's claim that Tucker possessed the external quality that Chief Knight stated was necessary to provoke change and correct the complacent attitudes of employees at the Prichard PD is false because Tucker continued to work with, and out of, the Prichard PD as a member of MCSENT, remained familiar with the City of Prichard, had relationships with many of the Prichard PD officers, and Chief Knight admitted Plaintiff had served less time in the Prichard PD "box" than the other candidates. *id.* at 33; and (vii) his qualifications were clearly of such weight and significance in comparison

with Tucker that a reasonable person exercising impartial judgment could not have chosen Tucker

for the 2019 PAO position, *id.* at 33-35.

The Court will address each of Plaintiff's pretext arguments in turn.

> **i.    Chief Knight stated the only reason Tucker was selected for the 2019 PAO position was Tucker possessed more years of law enforcement experience than Plaintiff, which contravenes the City's contention there were multiple factors that influenced the decision.**

This argument is not supported by the evidence.  Chief Knight's deposition testimony that

Watson submits to support his argument is as follows:

> Q.    Other than what you've told me about the differences in the law enforcement experience between the two, any other reason why you didn't give the promotion to Watson at the time?
> A.    That was it.
> Q.    And that would just be because Tucker had more law enforcement experience?
> A.    Yes.
> Q.    Anything about the nature of his law enforcement experience that opted you to pick Tucker over Watson?
> A.    I want to say no.  I wouldn't say the nature, even though, if you look at it, he has worked a lot of different divisions, but that didn't sway my decision either because, basically, I was going to fill somebody to handle the patrol division.
> Q.    Okay.  So the ultimate thing that swung your decision towards Tucker was his years of experience in law enforcement versus my client?
> A.    Yes.
> Q.    Anything else?
> A.    That's it.

Doc. 30 at 21-22; Doc. 31-2 at 154-55.  In Chief Knight's excerpted deposition testimony, in

response to the question, "Other than what you've told me about the differences in the law

enforcement experience between the two, any other reason why you didn't give the promotion to

Watson at the time," he responded, "That was it."  Doc. 31-2 at 154.  The question posed to Chief

Knight asks him to exclude what he previously discussed about the differences in law enforcement

experience between Tucker and Watson, which would include Tucker's experience with another

police department.  Further, in response to the question, "So the ultimate thing that swung your decision towards Tucker was his years of experience in law enforcement versus my client," Chief Knight responded, "Yes."  *Id.* at 154-55.  The question posed to Chief Knight does not exclude other reasons for his decision and inquires as to the "ultimate" factor that influenced his decision. In any case, Chief Knight previously stated he based his recommendation for the position on the interviews and applications and preferred a candidate who had worked at another police department or agency.  Doc. 31-2 at 71-72.

### ii.    The submitted evidence shows Major Hill, Officer Pitts, Moore, and Plaintiff were aware Tucker was pre-selected for the second major position, which shows pretext

For the reasons that are stated above, those statements are inadmissible and cannot be reduced to an admissible form.

### iii.    Tucker submitted false information on his application that indicated he met the APOSTC certification requirement that was described in the application, which should have disqualified him from consideration and is further evidence of pretext

This argument is not supported by the submitted evidence.  The job posting for the second major position allowed a candidate to obtain APOSTC certification within one year of employment if they were not certified when hired.  Doc. 25-8 at 2.  The job posting states for "Special Requirement:"

> Must have successfully completed the required minimum standards training to be a sworn law enforcement officer with the State of Alabama (APOSTC), preferably with current certification as a sworn law enforcement officer by the State of Alabama.  If not currently certified as a sworn law enforcement officer with the State of Alabama, must obtain APOSTC certification within one year of employment.

*Id.*

### iv.    Plaintiff argues the City's proffered reason to hire Tucker for the 2019 PAO position, Tucker's greater years of law

**enforcement experience, is inconsistent with its other proffered reason for the decision, the external quality that Chief Knight stated was necessary to provoke change and correct the complacent attitudes of employees at the Prichard PD**

As discussed above, while Chief Knight stated the ultimate factor in his decision to recommend Tucker for the 2019 PAO position was Tucker's law enforcement experience, it did not exclude other reasons for his decision, such as a preference for an outside candidate who had worked at another police department or agency.

> **v.    Tucker and Plaintiff possessed equal experience in the relevant field of law enforcement, since Tucker did not include his experience with the Mobile PD on his application for the second major position**

This argument is not supported by the submitted evidence.  Chief Knight stated Tucker's application did not list supervisory experience, but he was aware Tucker worked for the Mobile PD as a police officer 1 and believed he held that position until 2018.  Doc. 31-2 at 104-08.  Additionally, Moore, based on her interview notes, stated Tucker discussed his experience with the Mobile PD during his interview.  Doc. 39-1 at 2.  While Chief Knight told the EEOC, during a pre-determination interview, "he felt both candidates were equal when it came to supervisor's experience," that statement was prefaced by "Chief Knight explained that Tucker also supervised individual[s] on his shift," which means his statement was in regard to the type of supervisory experience Tucker and Plaintiff had and not the duration of the experience.  Doc. 31-6 at 21.  In the same EEOC pre-determination interview, as to the duration of supervisory experience, Chief Knight stated, "Tucker had more supervisory experience tha[n] [Plaintiff.]"  *Id.* at 20.  In any case, each of Tucker and Plaintiff's applications stated the length of their law enforcement supervisory experience, five and two years, respectively.  Doc. 31-3 at 58, 87.  While, Plaintiff in his application, in response to a question about the candidate's law enforcement and law enforcement

supervisory experience, included his experience as an infantry weapons and line squad leader and as an attorney who managed a law practice, such experience can be dismissed as law enforcement supervisory experience that is relevant to the major position.  Doc. 25-14.  Chief Knight also stated Tucker's law enforcement experience was the ultimate factor in his decision to recommend Tucker, and in that regard, Tucker had more experience than Plaintiff.  Doc. 31-2 at 154-55.

> **vi.    The City's claim that Tucker interviewed better than Plaintiff is speculative and not supported by the record because Chief Knight testified he could not recall much of what was discussed in the candidate interviews and could not state whether he actually scored and ranked Tucker over Plaintiff**

This argument is not supported by the submitted evidence.  Chief Knight described what he remembered of Plaintiff's interview and stated he discussed his military career, the cost analysis he proposed to hire for the major position in-house, he was "long-winded," his answers to questions were neither "short" nor "to-the-point," and when he was asked what he could bring to the Prichard PD, he "danced around [Chief Knight's] question."  Doc. 25-2 at 59-60.  While Chief Knight cannot produce notes from the interviews and cannot recall exact interview scores for each of the candidates, he stated he believed Tucker had the highest score, followed by Plaintiff, and there "might have been [ ] one point in between" them.  Doc. 31-2 at 147-48.  Again, Chief Knight stated he based his recommendation on both the applicants' interview performance and applications, not interview performance alone.  *Id.* at 71-72.

> **vii.    The City's claim that Tucker possessed the external quality that Chief Knight stated was necessary to provoke change and correct the complacent attitudes of employees at the Prichard PD is false because Tucker continued to work with, and out of, the Prichard PD as a member of MCSENT, remained familiar with the City of Prichard, had relationships with many of the Prichard PD officers, and Chief Knight admitted Plaintiff had served less time in the Prichard PD "box" than the other candidates**

Tucker left the Prichard PD in July 2011 then worked for the Mobile PD from July 2011 to 2019. Doc. 31-7 at 7, 34. While Tucker was not unknown to Chief Knight, Chief Knight stated he preferred a candidate who had worked at another police department or agency. Doc. 31-2 at 71-72. Chief Knight's preference for an outside candidate did not foreclose someone who was familiar with, and had been a part, of the Prichard PD, but had experience at another police department or agency.

In sum, the Court finds Watson has not rebutted the City's legitimate, nondiscriminatory reasons for its decision to hire Tucker, rather than Plaintiff, for the 2019 PAO position.

## 2. Convincing Mosaic of Circumstantial Evidence That Raises an Inference of Intentional Discrimination

Plaintiff argues he has presented a convincing mosaic of circumstantial evidence that raises an inference of intentional discrimination by the City. Doc. 30 at 37-38.

> Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employee," and (3) pretext. *Lewis* [*v. City of Union City*], 934 F.3d [1169,] 1185 [(11th Cir. 2019)].

*Jenkins*, 26 F.4th at 1250.

Plaintiff argues he has submitted many "tiles" to complete his convincing mosaic in addition to those instances of pretext that has already presented: (a) other than Plaintiff's promotion to sergeant, under Mayor Gardner's tenure, the Prichard PD has not had a white supervisory level employee despite the fact that the department is comprised of between fifteen

and twenty percent white officers; (b) the Prichard PD disparately applied discipline to employees in favor of African-American employees; (c) the Prichard PD made it clear it would operate without human resources oversight; (d) Mayor Gardner, Chief Knight, and other Prichard PD supervisors had a pattern and practice of circumventing the MCPB laws and regulations when they made hiring decisions, conducted side interviews, pre-selected candidates for positions outside of the MCPB process, and revised job requirements; (e) Chief Knight cannot recall who he ranked higher based on the interviews and his interview notes are missing; and (f) there are disputed facts about whether Tucker communicated with Mayor Gardner and Chief Knight about his interest in the second major position prior to, and outside of, the MCPB selection process. *Id.* at 37-38.

The Court will address each of Watson's arguments in turn.

> **a.      Other than Watson's promotion to sergeant, under Mayor Gardner's tenure, the Prichard PD has not had a white supervisory level employee despite the facts that the department is comprised of between fifteen and twenty percent white officers**

This argument does not have any probative value as to discriminatory intent.  "Statistics without any analytical foundation are virtually meaningless." *Wilson*, 376 F.3d at 1089 (internal quotation marks and citations omitted).  Plaintiff has not provided relevant information to contextualize his argument, including how many white employees applied for supervisory level positions and were not hired.

> **b.      The Prichard PD disparately applied discipline to employees in favor of African-American employees**

Plaintiff has not presented a similarly situated comparator to show discriminatory intent. A similarly situated comparator is "someone who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224).  "[W]hat constitutes a 'material' similarity or difference will differ from case to case, ordinarily a similarly situated comparator and

the plaintiff will: have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Id.* (citing *Lewis I*, 918 F.3d at 1227-28). The lone incident put forth by Plaintiff that involved a white employee of the Prichard PD who was disciplined is the incident when he was disciplined for his argument with Tucker. For a similarly situated comparator, Plaintiff puts forth the two separate incidents between Tucker, and Jackson and Jones. Doc. 25-4 at 58; Doc. 31-5 at 116-17. The separate arguments between Tucker, and Jackson and Jones were separate arguments with Tucker, but in Watson's case that resulted in discipline, his argument with Tucker was preceded by, and related to, his instruction to a subordinate officer to release a suspect who was previously in a vehicle pursuit in an attempt to elude arrest by the officer. Additionally, Watson has not shown either Jackson or Jones share with Watson an employment or disciplinary history.

        **c.**    **The Prichard PD made it clear it would operate without human resources oversight and Chief Knight, Mayor Gardner, and other Prichard PD supervisors had a pattern and practice of circumventing the MCPB laws and regulations when they made hiring decisions, conducted side interviews, pre-selected candidates for positions outside of the MCPB process, and revised job requirements, those arguments are related and will be discussed together**

Moore's anecdotal evidence of human resources circumvention and related conduct by Mayor Gardner, Chief Knight, and Prichard PD supervisors is short of specifics that show the City operated outside the MCPB hiring process for Prichard PD positions to discriminate based on race. The only specific instance when Moore alleged the City intervened in the MCPB hiring process was when Mayor Gardner requested the job requirements for the 2017 PAO position be changed to allow candidates who were not employed with the Prichard PD, which allowed Major Hill to qualify as a candidate in addition to the previously qualified candidate, Thompson, both of whom are African American. Doc. 31-4 at 21-24. Moore's testimony may show arguably bad judgment

by Chief Knight, Mayor Gardner, and other Prichard PD supervisors but falls short of intentional discrimination based on race.

d.   **Chief Knight cannot recall who he ranked higher based on the interviews and his interview notes are missing**

As the Court stated, while Chief Knight cannot produce notes from the interviews and cannot recall exact interview scores for each of the candidates, he stated he believed Tucker had the highest score, followed by Watson, and there "might have been [ ] one point in between" them. Doc. 31-2 at 147-48. Chief Knight stated he based his recommendation on both the applicants' interview performance and applications, not interview performance alone. *Id.* at 71-72.

e.   **There are disputed facts about whether Tucker communicated with Mayor Gardner and Chief Knight about his interest in the second major position prior to, and outside of, the MCPB selection process**

Plaintiff references a quote that the Prichard PD submitted to the EEOC, "Tucker had made known that he was interested in returning the City of Prichard and the mayor discussed with Tucker that the [major position] was becoming available." Doc. 30 at 9 n.10. The Court notes Plaintiff does not cite to the record evidence to support the Prichard PD's quote. Further, Plaintiff cites to Chief Knight's testimony that he spoke to Tucker when Tucker was at the Prichard PD building after the 2019 PAO position was posted and Tucker told Chief Knight he applied for the position to which Chief Knight replied, "Okay." Doc. 31-2 at 46-47. The Court finds the cited communications do not show intentional discrimination by the City.

Accordingly, Plaintiff has not presented a convincing mosaic of circumstantial evidence that creates a triable issue concerning the City's discriminatory intent.

### IV.   CONCLUSION

Accordingly, Defendant City of Prichard's motion for summary judgment (Doc. 25) is **GRANTED**, and Plaintiff Russell Watson's claim against Defendant City of Prichard is

**DISMISSED with prejudice**.

Final judgment pursuant to Fed. R. Civ. P. 58 will issue separately.

**DONE** and **ORDERED** this 20th day of January 2023.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED S TATES DISTRICT JUDGE